# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THE COUNTY OF LOS ALAMOS,

      Plaintiff,

vs.                             No. CIV 05-1343 JB/LAM

UNITED STATES DEPARTMENT OF
ENERGY, and SAMUEL BODMAN,
Secretary of the Department of Energy,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Notice of Motion for Preliminary Injunction, filed December 27, 2005 (Doc. 2). The Court held an evidentiary hearing on January 4, 2006. The primary issue is whether the Plaintiff, the County of Los Alamos, has carried its burden of showing a clear and unequivocal right to a temporary restraining order blocking the construction of new security measures near the Los Alamos National Laboratory ("LANL"). Because the County has failed to satisfy its burden on the four elements for a TRO, the Court will deny the County's request for a TRO. The Court will further treat the County's request for a preliminary injunction as withdrawn unless the County informs the Court that it desires a hearing on a preliminary injunction.

## FACTUAL BACKGROUND

LANL is a federal facility located in Los Alamos, New Mexico that comprises approximately forty square miles of both developed and forested land. See Environmental Assessment for Proposed Access Control and Traffic Improvements at Los Alamos National Laboratory, Los Alamos, New Mexico, DOE/EA-1429 ("EA") at 1. The National Nuclear Security Administration ("NNSA")

administers the site for the federal government; the University of California operates the site under a contract. See id. LANL is one of three national security laboratories that support the Department of Energy's ("DOE") responsibilities for national security, energy resources, environmental quality, and science. See id. at 3.

The current security procedures have been in place for the past several years. See id. The general public has long enjoyed unrestricted vehicular access to LANL, where roads with public access pass within close proximity to Hazard Category 2 nuclear operations. See id. Hazard Category 2 facilities are those for which a hazard analysis identifies the potential for significant onsite consequences in the event of certain accidents. See id.

In the wake of the terrorist attacks of September 11, 2001, temporary measures were put in place to improve physical security within LANL. See id. These measures include traffic restrictions or road closures when security or operational conditions warrant. See Declaration of Edwin L. Wilmot ¶ 2, at 1-2 (executed January 3, 2006)(hereinafter "Wilmot Decl."). As a consequence of its efforts to enhance LANL's security, and thus national security, the NNSA developed plans to alter the perimeter road at LANL to control access to the facility's interior. See EA at 3, 5.

In January 2002, DOE identified proposed actions to permanently address physical security concerns at the facility and to allow for restricted access to sensitive areas of LANL during periods of elevated security risk. See id. at 3. As evidenced in their preparation of the EA, the Defendants determined that the National Environmental Policy Act of 1969 ("NEPA") was an appropriate process with which to proceed before implementing the project. See id. at 1. In developing this plan, the Defendants, as NEPA requires, evaluated the proposed action's environmental impact. See id. at 35-44. The Defendants prepared an EA analyzing the plan and evaluating its environmental

impact, which resulted in the decision to prepare a Finding of No Significant Impact ("FONSI").  See generally EA.

According to the EA, the purpose and need for the Project included, among other things, a "change [in] certain traffic flow patterns for the purpose of enhancing physical security at LANL." Id. at 4.  The plan primarily included the construction of eastern and western bypass roads around the LANL Technical Area ("TA") 3 and the installation of vehicle access controls and related improvements to enhance security in the LANL core area.  See Affidavit of Cynthia Ardito ¶ 3, at 1-2 (executed December 23, 2005)(hereinafter "Ardito Aff.").  The access areas were designed to restrict access to those that need to be in the TA-3 area, without restricting roads that are currently used for public access to areas outside of LANL.  See id.  The access control stations would screen traffic entering the LANL core area.  See EA at 5-11.  These stations would replace the temporary screening measures already in place.  See id. at 3.

A draft EA was made available for public review and comment.  See Federal Defendants' Opposition to Plaintiff's Motion for Temporary Restraining Order ("Response") at 3, filed January 3, 2006 (Doc. 7).  Specifically, the Defendants contend that the draft EA was circulated to the County for review and comment.  See Wilmot Decl. ¶ 5, at 2.  The final EA and FONSI issued on August 23, 2002.  See generally EA.  No one, including the County, challenged this decision.  See Response at 3.  After DOE issued the FONSI, but before the Project was fully implemented, DOE and NNSA experienced budgetary constraints that required the DOE to scale down the Project.  See Wilmot Decl. ¶ 4, at 2.

In reconsidering their proposed action, the Defendants made significant changes to their proposed plans and introduced different measures which have the effect of diverting traffic and

potentially blocking a major transportation artery, with allegedly significant and adverse environmental and safety impacts.  See Affidavit of Wayne D. Torpy ¶¶ 6-7, at 2-3 (executed December 22, 2005)(hereinafter "Torpy Aff.").  Under the modified Project, access control structures were retained, but reconfigured in number and placement, and construction of the bypass road described in the EA was eliminated.  See NEPA Compliance Review for Proposed Modifications to the Security Perimeter Project at Los Alamos National Laboratory ("NEPA Compliance Review") at 8.  A minor paving project, however, was included to facilitate access to a local ski area.  See id.  The DOE also made various changes in the supporting road improvements to accommodate the Project's reduced scale.  See id.

Rather than perform an EA of this new proposal, the Defendants performed, with respect to each modification, what they call a NEPA Compliance Review to justify the avoidance of any further EA.  See id. at 14.  While the DOE maintains that it did not need to do a NEPA Compliance Review, it represents that it completed this analysis in an abundance of caution to assure, on a resource-by-resource basis, that the proposed modifications did not significantly change or increase the Project's potential environmental effect.  See Response at 3-4.  The NEPA Compliance Review analyzed whether the proposed modifications to the Project would require additional NEPA analysis.  See NEPA Compliance Review at 14.

These determinations were made in February 2003, March 2004, and April 2005, respectively. See Response at 4.  Although NEPA Compliance Reviews are internal documents, each review was made available to the County.  See Wilmot Decl. ¶ 5, at 2-3.  In each instance, the DOE determined that a supplemental NEPA analysis was not required because the environmental impacts of the scaled-down Project, as modified, would be equal to or less than the full-scale Project examined in the EA.

See id.

The changes to the proposed plan include the following elements: (i) three new access control stations would be constructed which would restrict access to LANL to a total of four access control points – one station presently exists; (ii) a new intersection would be constructed where Diamond Drive and East and West Jemez Road come together, which would permanently reroute traffic through a physical separation of the road lanes; (iii) West Jemez Road would be closed to unscreened vehicle traffic, which would restrict the primary access of a non-federal research park and fire station which are both located on the section of West Jemez that would be restricted; and (iv) additional minor relocation and demolition of existing structures and utilities would occur to construct the access control stations and redesign associated roads and intersections. See NEPA Compliance Review at 2-9.

The modifications to the road network restrict access to the western area of Los Alamos and one of the County's few evacuation routes, which allegedly raises serious safety concerns. See Torpy Aff. ¶ 5, at 2. The closure of West Jemez also affects the primary access to a non-federal research park and has negative economic implications. See Affidavit of Kevin Holsapple ¶ 7, at 2 (executed December 22, 2005)(hereinafter "Holsapple Aff."). Lastly, according to the County, the traffic implications and road construction will have effects on the environment that have not been properly analyzed to provide the required information for decisions that the Defendants made. See Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction ("Plaintiff Memorandum") at 5, filed December 27, 2005 (Doc. 3)(citing Ardito Aff. ¶¶ 4-5, at 2).

The County contends that the NEPA Compliance Review also identified the need for additional projects that would result from the proposed changes, but did not assess the cumulative

effects of these projects.  See id. at 5 (citing NEPA Compliance Review at 8).  It is this Compliance

Review, and the consequent alleged failure to perform a meaningful environmental analysis, which

is the basis for this litigation.

The Defendants, in their NEPA Compliance Review, focus their discussions on the impacts

of closing West Jemez Road and reconfiguring the intersection at Diamond Drive and West Jemez

Road.  See NEPA Compliance Review at 8-13.  Although mention is made regarding the necessity

of paving and improving Ski Hill Road, so as to maintain access to recreational areas, and it is

recognized that this project is a direct result of closing West Jemez Road, the NEPA Compliance

Review refers to this project as "a separate but related action."  Id. at 8.

The Defendants contend that, throughout this entire process, they have provided ample

opportunity for the County to be involved.  See Response at 4.  DOE also meets regularly with the

County to discuss the Project, modifications thereto, and implementation status.  See Wilmot Decl.

¶ 5, at 2.  The County has met with the Defendants several times over the past year to discuss the

changes to the road network project and NEPA requirements, including a reasonable look at viable

alternatives.  See Holsapple Aff. ¶ 4, at 1-2.  While in these discussions, the County understood that

the Defendants were not taking action that would irretrievably commit the government's resources

with the hope of arriving at suitable mitigation measures for the adverse impact of the planned action.

See Plaintiff Memorandum at 6.  It now appears that the Defendants have initiated construction of

the control stations.  See Affidavit of J. Kyle Zimmerman ¶ 5, at 2 (executed December 23, 2005);

Transcript of Hearing at 13:13-14:1 (taken January 4, 2006).[1]

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

A fixed-price, design-build contract for the Project was executed on August 5, 2005, and initial activities, including limited utilities and preparatory work, commenced on or about September 2005. See Wilmot Decl. ¶ 6, at 3. Activities that would impact existing roadway conditions – i.e., road manipulation, paving, changed traffic patterns, etc. – are not expected to begin until on or about March 2006. See id. The access control stations on Jemez Road – which are the crux of the County's concern – will be activated in phases as they are completed, with the first scheduled to be operational no earlier than August 2006. See id.

## PROCEDURAL BACKGROUND

After exhausting what it considers to be all reasonable means to resolve this dispute without litigation, the County filed this action to enjoin the Defendants until such time as they properly address the environmental consequences of the Project. See generally Complaint, filed December 27, 2005 (Doc. 1). Specifically, the County requested that the Court: (i) declare the NEPA Compliance Review insufficient under NEPA; (ii) declare the Defendants' separate extension of the Ski Hill Road Bypass project an unlawful act of segmentation under NEPA; (iii) compel the Defendants to prepare a new EA; (iv) enjoin the Defendants from irreversibly and irretrievably committing resources to the Project before completing an EA; (v) award the County litigation costs; and (vi) grant the County other necessary and appropriate relief. See id. ¶¶ A-F, at 24-25.

The County moves, pursuant to rule 65 of the Federal Rules of Civil Procedure, for a temporary restraining order and preliminary injunction enjoining the Defendants' actions. See Plaintiff Memorandum at 1. Specifically, the County seeks an emergency injunction to halt the Project. See id. The County requests a temporary restraining order and, upon its expiration, a preliminary injunction, enjoining the Defendants from taking any action to implement the Defendants'

modifications to the road network at LANL.  See id. at 17.  The County has submitted declarations and exhibits in support of its motion.  The County requests a hearing on this motion.

The County contends that it can show a strong likelihood of success on the merits because the Defendants did not complete a new EA, or a document similar to a Supplement Analysis, for the proposed modifications to the Project's original plan.  See id. at 9-10.  The County asserts that the Defendants improperly relied on the previous EAs in failing to prepare a modified FONSI for the proposed modifications to the Project.  See id. at 10-11.  Also, the County argues that the Defendants failed to involve the public through review and comment of the NEPA Compliance Review.  See id. at 11-12.  The County maintains that DOE improperly divided the Project into separate parts and failed to address the cumulative impacts of the entire Project.  See id. at 12-13.    As to the other prongs of the TRO standard, the County alleges that irreparable harm, in the form of environmental damage, is sufficiently likely to occur from the Project to warrant injunctive relief.  See id. at 13-14.  As for balancing the hardships, the County asserts that the temporary delay in construction that the Defendants will suffer does not outweigh the potential harm of the Project to the community.  See id. at 14-15.  According to the County, injunctive relief is in the public interest to ensure compliance with NEPA and prevent potentially irreversible harm to the environment.  See id. at 15-16.

The Defendants oppose the County's motion for a TRO.  The Defendants have styled their response as a response to the County's TRO Motion and, in light of the compressed holiday time frame under which the Defendants have had to prepare their response, reserve the right to file a separate, more thorough response to the County's Motion for a Preliminary Injunction at a later date as the Court deems appropriate.  See Response at 1 & n.1.

The Defendants contend that the County has not shown what harm will occur if the Court

does not grant a TRO.  See id. at 10-11.  According to the Defendants, the County bases its
irreparable harm argument on generalized speculation.  See id. at 11.  The specific harms to which
the County points – hindering access to recreational areas, chilling investment in a privately owned
research park, and restricting access to evacuation routes – are either economic, and thus non-
environmental, in nature or are unsupported by any evidence.  See id. at 11-12.  The Defendants also
maintain that the new, permanent security measures merely enhance the temporary measures already
in place.  See id. at 12.  Even so, the Defendants argue that any harm that the County will allegedly
suffer will not occur for more than six months.  See id. at 13.  The Defendants further assert that the
County waited too long to seek injunctive relief because the modification to the Project forming the
basis of this lawsuit took place in March 2004, yet the County waited until December 2005 to file this
suit.  See id. at 13-14.

As to the other factors for injunctive relief, the Defendants believe that the balancing of harms
tips in their favor because national security, along with the safety of LANL's workers, will be
damaged if the Court blocks the Project.  See id. at 16.  On the other side of the ledger, the harm to
the County of not issuing the injunction will allegedly be delays at checkpoints later in 2006.  See id.
Furthermore, the Defendants argue that the County will not succeed on the merits because DOE
concluded that the potential impact of the modification to the Project was equal to or less than the
impacts previously analyzed, and that therefore a supplemental EA was unnecessary.  See id. at 18-
19.  The Defendants maintain that the decision whether to supplement a NEPA analysis is not subject
to public review.  See id. at 19.

The Court held an evidentiary hearing on January 4, 2006.  The County told the Court that
it would not have sought injunctive relief if the Defendants had not modified the Project after

conducting the EA, and that the original EA met NEPA's requirements.  See Transcript of Hearing at 7:8-8:1.  The County cited to a case from the United States Court of Appeals for the First Circuit which held that failure to conduct a proper EA itself constitutes irreparable harm.  See id. at 11:2-5. When asked what specific environmental interest could be endangered in the short run, the County pointed to concerns over public safety and the ability of the County to respond to emergencies and evacuate residents quickly.  See id. at 16:3-17:7.  The County conceded that the Project would not implicate its concerns until August 2006.  See id. at 17:24-18:32.  The County stated that it did not believe that Wilmot's statement in his affidavit – that the County received drafts of the compliance review as the process went forward – was correct.  See id. at 19:7-13.

The County called Wayne D. Torpy, the Chief of the Los Alamos County Police Department, to testify at the hearing.  Torpy stated that, in the event of an emergency evacuation following completion of the Project, traffic would back up around the intersection of Diamond Drive and West Jemez Road.  See id. at 33:1-23.  Also, if emergency responders could not get through the access control point at that intersection, then they would have to take a detour around it, thereby greatly increasing travel time for the responders.  See id. at 34:14-35:18.  Torpy explained that everything he knew about the project came from the exhibits introduced in Court.  See id. at 37:24-38:3, 40:5-7. Torpy testified that the road configuration is designed to slow down vehicles.  See id. at 39:1-3. According to Torpy, even if one lane was left open for emergency responders, the County might still face a congestion problem.  See id. at 41:15-20.

The County further argued that, if irreparable harm results automatically from a NEPA violation, as the First Circuit stated, then irreparable harm already exists; on the other hand, if irreparable harm is measured as to the risks described by Torpy, then that harm will not happen until

August 2006.  See id. at 44:25-45:7.  The County urged the Court not to give the Defendants any deference, or give them only a "slight amount of deference," on the construction of their rules.  Id. at 49:1-21.

The Defendants argued that the Court should deny the County a TRO if there is no irreparable injury that will occur in the next ten days or before the Court can hold a preliminary injunction hearing.  See id. at 51:18-25.  The Defendants alleged that the County has provided no evidence that it will suffer environmental injury.  See id. at 52:13-21.  The Defendants asserted that the only harm put forth by the County involves public safety, not the environment.  See id. at 53:13-22.  The Defendants contended that public safety would only be a consideration with regard to the *environmental* impact on public safety.  See id. at 59:21-60:1.  The Defendants also explained that the reasons for the redesign included budgetary issues and a desire to increase the fluidity of traffic going through the checkpoint by adding more lanes.  See id. at 57:9-58:12.  The Defendants represented that their interpretation of their regulations and their determination that the environmental impact of the modifications would be equal to or less than the original modifications are entitled to deference.  See id. at 64:18-21, 68:4-24.

The County responded that the modification is different as to geography, "magnitude," location, and "intensity of activity."  Id. at 73:21-25.  The County stated that the impact analysis in the NEPA Compliance Review was conclusory.  See id. at 74:10-15.  The County asserted that the Project's impact on emergency responders is a "health issue" that the EA process should examine.  See id. at 75:3-9.  The County explained that it had been trying to resolve this issue without litigation, but that it came to Court as it became clear that "the construction activities are actually ongoing unabated."  Id. at 77:25-78:6.

## STANDARDS FOR ISSUANCE OF EMERGENCY INJUNCTIVE RELIEF

Emergency injunctions, be they TROs or preliminary injunctions, are exceptional and drastic remedies, and the plaintiff bears a heavy burden in establishing that such emergency injunctive relief should issue.  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)(citation omitted).   The requirements for the issuance of a TRO are similar to those for the issuance of a preliminary injunction.  See 13 J. Moore, Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The movant must make a "clear showing."  Mazurek v. Armstrong, 520 U.S. at 972.  "[T]he right to relief must be clear and unequivocal."  Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)(citation omitted).   The movant's requirement for substantial proof is much higher for a motion for a preliminary injunction than it is for summary judgment.  Mazurek v. Armstrong, 520 U.S. at 972.

The courts use a well-established four-part test to decide whether to grant injunctive relief. To obtain a TRO, the moving party must establish four requirements: (i) a substantial likelihood of success on the merits; (ii) irreparable injury to the movant if the relief is denied; (iii) the threatened injury to the movant outweighs the injury to the other party under the TRO; and (iv) the TRO, if issued, is not adverse to the public interest.  See Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001); Walmer v. U.S. Dep't of Def., 52 F.3d 851, 854 (10th Cir. 1995)(citation omitted).

For example, in Walmer v. U.S. Dep't of Def., the Tenth Circuit assumed that the plaintiff had met three of the requirements, see 52 F.3d at 854 n. 6, but affirmed the district court's denial of injunctive relief because the plaintiff had failed to meet the "modified likelihood of success" requirement, see id. at 854-56.  In Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army, 111 F.3d 1485 (10th Cir. 1997), the Tenth Circuit upheld a denial of a motion for a preliminary

injunction and stated that the plaintiff's failure on the balance-of-harms requirement "obviat[ed]" the need to address other arguments justifying a preliminary injunction. 111 F.3d at 1489. See Sprint Spectrum, L.P. v. State Corp. Comm'n, 149 F.3d 1058, 1060 (10th Cir. 1998)("The district court ruled that the wireless providers failed to satisfy the first two preliminary injunction requirements. However, we need not address the second because the first – substantial likelihood of prevailing on the merits – clearly supports the denial of the preliminary injunction."). Thus, if the plaintiff fails to meet its burden on even one of the requirements for a TRO, the court should deny the request for emergency injunctive relief. And the invocation of an environmental statute such as NEPA does not alter these traditional rules for injunctive relief, and there is no presumption that an injunction automatically follows if there is any violation of an environmental statute. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982).

Under some circumstances, the Tenth Circuit has recognized a relaxed "modified likelihood of success" requirement. A plaintiff may establish a likelihood of success in a modified manner where it has made a showing that the latter three factors "tip strongly" in its favor. See Valley Comty. Preservation Comm'n v. Mineta, 373 F.3d 1078, 1083-84 (10th Cir. 2004)(quoting Greater Yellowstone Coalition v. Flowers, 321 F.3d at 1256)(internal quotations omitted). "If the movant has satisfied the first three requirements for a preliminary injunction, the movant may establish likelihood of success by showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." Walmer v. U.S. Dep't of Def., 52 F.3d at 854 (citation omitted). The modified showing of likelihood of success will be met "by showing that questions going to the merits are so serious, substantial,

difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Greater Yellowstone Coalition v. Flowers, 321 F.3d at 1256 (quoting Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002)).

Courts have held that environmental injury is often permanent or at least of long duration, and is generally considered irreparable. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."). Refusal of administrative agencies to comply with environmental laws "invokes a public interest of the highest order: the interest in having government officials act in accordance with law." Seattle Audubon Society v. Evans, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991)(citation omitted), aff'd in part and rev'd on other grounds, 952 F.2d 297 (9th Cir. 1991). Indeed, the Tenth Circuit's decision in Davis v. Mineta suggests that "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." 302 F.3d at 1114.

The Defendants argue that the Tenth Circuit's statement in Davis v. Mineta must yield to the Supreme Court's holdings in Amoco and Weinberger. Any conflict between the Tenth Circuit's decision in Davis v. Mineta and the Supreme Court's earlier decisions is one for the Tenth Circuit to work out, not for this district court. The Defendants then argue that, even if Amoco and Weinberger were merely Tenth Circuit decisions, they would be binding on a district court over the subsequently decided Davis case. See, e.g., Haynes v. Williams, 88 F.3d 898, 900 n. 4 (10th Cir. 1996)(stating that "when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom" (citations omitted)). Again, if there is a conflict within the Tenth

-14-

Circuit decisions, that is one for the Tenth Circuit to work out, not this Court.

In the end, what the Defendants are arguing is that the Tenth Circuit incorrectly decided Davis v. Mineta.  Other circuits have held that, "in the context of environmental injury, irreparable damage is not presumed in evaluating agency action." Sierra Club v. Penfold, 857 F.2d 1307, 1318 (9th Cir. 1988)(citing Amoco Prod. Co. v. Village of Gambell, 480 U.S. at 531).  See Save the Yaak Committee v. Block, 840 F.2d 714, 722 (9th Cir. 1988)(citing Amoco Prod. Co. v. Village of Gambell, 480 U.S. at 531 for the conclusion that "the Supreme Court has rejected a presumption of irreparable injury when an agency fails to thoroughly evaluate the environmental impact of a proposed action" (emphasis omitted)); Town of Huntington v. Marsh, 884 F.2d 648, 651 (2d Cir. 1989)(noting that "injunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations" (citation omitted)).  In any case, even the Tenth Circuit in Davis v. Mineta required that the "[p]laintiffs must still make a specific showing that the [presumed] environmental harm results in irreparable injury to their specific environmental interests." 302 F.3d at 1115.

## REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT

Where a statute, such as NEPA, does not provide for a private right of action, the Administrative Procedure Act ("APA") provides for judicial review for challenges to final agency actions.  See, e.g., State of Utah v. Babbitt, 137 F.3d 1193, 1203 (10th Cir. 1998).  Pursuant to Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."

In accordance with the APA, the applicable standard of review is "arbitrary and capricious." A reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Conversely, agency

action must be set aside under the APA if it is arbitrary, capricious, an abuse of discretion, or

otherwise contrary to law.  See id.

> Under this standard, the scope of judicial review is narrow and deferential:
>
> A reviewing court must "consider whether the decision was based on a consideration
> of the relevant factors and whether there has been a clear error of judgment. . . .
> Although this inquiry into the facts is to be searching and careful, the ultimate
> standard of review is a narrow one.  The court is not empowered to substitute its
> judgment for that of the agency."  The agency must articulate a "rational connection
> between the facts found and the choice made."  While we may not supply a reasoned
> basis for the agency's action that the agency itself has not given, we will uphold a
> decision of less than ideal clarity if the agency's path may reasonably be discerned.

Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974)(citations

omitted).  See Friends of the Earth v. Hintz, 800 F.2d 822, 831 (9th Cir. 1986)("The court may not

set aside agency action as arbitrary or capricious unless there is no rational basis for the action."

(citation omitted)).

A deferential approach is particularly appropriate where the challenged decision implicates

substantial agency expertise.  "When specialists express conflicting views, an agency must have

discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter,

a court might find contrary views more persuasive."  Marsh v. Oregon Natural Res. Council, 490

U.S. 360, 378 (1989).  "Because analysis of the relevant documents requires a high level of technical

expertise, we must defer to 'the informed discretion of the responsible federal agencies."  Id. at 377

(citing Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976))(internal quotations omitted).  See Baltimore

Gas and Electric Co. v. NRDC, 462 U.S. 87, 103 (1983)("When examining this kind of scientific

determination, . . . a reviewing court must generally be at its most deferential." (citation omitted)).

When a federal agency interprets its own regulations, its interpretation is afforded special

consideration. "[A]n agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference." Bar MK Ranches v. Yuetter, 994 F.2d 735, 738 (10th Cir. 1993)(citing City of Gillette, Wyoming v. FERC, 737 F.2d 883, 884-85 (10th Cir. 1984)). Pursuant to this highly deferential standard, a federal court may reject an agency's interpretation of its own regulations only when the interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." Id. at 738. See Stinson v. United States, 508 U.S. 36, 45 (1993)("[P]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." (internal quotations and citations omitted)). An action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

## NEPA

NEPA evidences a congressionally declared national interest in environmental protection and information disclosure by federal agencies. See 42 U.S.C. § 4321. NEPA's goal is to "encourage productive and enjoyable harmony between man and his environment." Id. NEPA's purpose is to ensure that an agency considers the potential environmental harms that could result from agency action. See Fuel Safe Wash. v. FERC, 389 F.3d 1313, 1318 (10th Cir. 2004)("In contemplating major Federal actions significantly affecting the quality of the human environment, agencies must prepare an environmental impact statement (EIS) in which they consider the environmental impact

of the proposed action and compare this impact with that of alternatives to the proposed action."
(internal quotations and citations omitted)).  In view of this purpose, NEPA requires the agency to
comply with the NEPA process in assessing the environmental impact on the proposed plan, as well
as reasonable alternatives, and to involve the public through review and comment.  Utahns v. United
States DOT, 305 F.3d 1152, 1163, 1166 (10th Cir. 2002)(explaining that NEPA requires that
agencies "rigorously explore and objectively evaluate all reasonable alternatives" and describing
"informed public comment" as one of NEPA's goals), modified on other grounds, 319 F.3d 1207
(10th Cir. 2003).

Congress designed NEPA to ensure "a fully informed and well-considered decision." Metro.
Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 776 (1983)(citation omitted).  NEPA
encourages good planning by defining an analysis process for sound decision-making considering the
technical, economic, and environmental factors.  See National Helium Corp. v. Morton, 486 F.2d
995, 1002 (10th Cir. 1973).  NEPA requires federal agencies to systematically assess the
environmental impacts of their proposed actions and consider alternatives to accomplishing their
missions in ways which are less damaging to the environment.  Utahns v. United States DOT, 305
F.3d at 1166.

NEPA controls an agency's planning and decision-making process. See 42 U.S.C. § 4332(A).
NEPA requires federal agencies, including the DOE, to take a "hard look" at the environmental
consequences of any major federal action significantly affecting the quality of the human environment.
See Kleppe v. Sierra Club, 427 U.S. at 410 n.21.

> NEPA is designed to influence the decision making process; its aim is to make
> government officials notice environmental considerations and take them into account.
> Thus, when a decision to which NEPA obligations attach is made without the
> informed environmental consideration that NEPA requires, the harm that NEPA

intends to prevent has been suffered.

Massachusetts v. Watt, 716 F.2d 946, 952 (1st Cir. 1983)(citations omitted).  When making its decision, the agency should consider information collected in the NEPA process.  See Fund for Animals, Inc. v. Espy, 814 F. Supp. 142, 151 n.10 (D.D.C. 1993)(describing harm that a violation of NEPA causes as "serious" and "obviously irreparable once the contemplated action becomes a fait accompli").

When an agency proposes an action, NEPA requires a consideration of appropriate environmental factors, involving the affected and interested public early in the process, and documenting the environmental analysis process for the decision-maker and the public.  Under NEPA, an agency may not make an "irreversible and irretrievable commitment" of federal resources before complying with NEPA.  Conner v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1988)(citation omitted).

NEPA also created the Council on Environmental Quality ("CEQ") to develop NEPA implementation regulations.  See Tomac v. Norton, No. 05-5206, 2006 U.S. App. LEXIS 270, at *9 (D.C. Cir. January 6, 2006)(citation omitted).  The CEQ regulations specify three levels of analysis. See West v. Secretary of the DOT, 206 F.3d 920, 927 (9th Cir. 2000).

The first level of analysis considers whether the proposed federal action will significantly affect the quality of the human environment.  The purpose is to determine whether the proposal qualifies as a Categorical Exclusion ("CX").  To qualify, the proposed action must demonstrate through prior analysis clearly insignificant impacts on the environment.  Citizens' Comm. to Save Our Canyons v. United States Forest Serv., 297 F.3d 1012, 1023 (10th Cir. 2002).  If the CX criteria are met, the regulations do not require further analysis.

The second level of NEPA analysis requires an EA, which are documents prepared to identify

potential environmental impacts and determine whether an EIS is required.  See id. at 1022.  An EA

must include brief discussion of the need for the proposal, alternatives to the proposal, analysis of the

environmental impacts of the proposed action and alternatives, and a listing of agencies and persons

consulted.  See 40 C.F.R. § 1508.9(b).

EAs result in either the decision to prepare a FONSI or an EIS.  See Citizens' Comm. to Save

Our Canyons v. United States Forest Serv., 297 F.3d at 1022.  If the proposed action, as determined

by the agency, will significantly affect the environment, an EIS is required.  See Kern v. United States

BLM, 284 F.3d 1062, 1067 (9th Cir. 2002).  An EIS should "discuss the purpose and need for the

proposed action, environmental impacts resulting from the actions, unavoidable adverse

environmental impacts, alternatives to the proposed action, the relationship between short-term uses

and long-term productivity, and the amount of resources that must be devoted to the proposed

action."  Citizens' Comm. to Save Our Canyons v. United States Forest Serv., 297 F.3d at 1022

(citations omitted).

"To effectuate the goals of NEPA, the CEQ created rules requiring agencies to establish

implementing procedures that facilitate the evaluation of management decisions and the environmental

effects of proposed federal agency actions."  See Heartwood, Inc. v. United States Forest Serv., 230

F.3d 947, 949 (7th Cir. 2000).  The Defendants' implementing regulations specify the process to

follow when there are changes to previously prepared NEPA documents.  EIS's, see 10 C.F.R. §

1021.310, site-wide EAs for programmatic NEPA documents, see 10 C.F.R. § 1021.330, and project-

specific EAs, see 10 C.F.R. § 1021.321, have their own processes based on the information they

generally provide.

When an EIS is prepared, and more information becomes available, or there are discrete

changes to the proposed plan, a Supplement Analysis may be appropriate to determine whether a full supplement is needed for the EIS.  See, e.g., 10 C.F.R. § 1021.314(c).  The regulations allow for an analysis "similar to the Supplement Analysis" to determine whether existing site-wide EAs remain adequate.  10 C.F.R. § 1021.330(e).  The County contends that, when a project-specific EA has been prepared in support of an agency decision that has resulted in a FONSI, and changes occur, a modified FONSI should be prepared if the related EA supports the finding that the proposed action will not have a significant effect on the human environment.  A FONSI may be revised at any time so long as an existing EA supports the revision.  See 10 C.F.R. § 1021.322(f).

When an agency undertakes closely related activities, those activities should be considered in a single NEPA document and not divided into separate parts or projects.  See 40 C.F.R. § 1508.25.  Taken alone, a project may not have a significant impact, but taken together with other sufficiently related projects, an action could have a cumulative significant impact, raising a NEPA compliance issue.  See Thomas v. Peterson, 753 F.2d 754, 759 (9th Cir. 1985).  The CEQ provides a broad definition of scope, which is intended in part to address those instances where an agency may try to avoid NEPA by segmentation of the projects.  See id. at 760; 40 C.F.R. § 1508.25.

## ANALYSIS

The emergency request that the County seeks is an extraordinary remedy.  The County dedicates the majority of its preliminary injunction brief to argument about the procedural and substantive adequacy of the Defendants' March 2004 decision.  The Court will deny the County's motion for a TRO because the County has not carried its heavy burden of satisfying all four factors for injunctive relief.  The County has not shown that it will suffer irreparable harm within the next ten or twenty days.  In addition, the County has not demonstrated that it will suffer more hardship from

a denial of its request for a TRO than the Defendants will suffer if the Court grants its request for a

TRO.  Also, the County has not proven that a TRO will not harm the public interest. Because the

Court finds that the County has not made a clear showing on any of the three requirements that go

to the equities, the County is not entitled to the Tenth Circuit's modified likelihood of success

standard.[2]  Although the Court is concerned that the Defendants' NEPA process was flawed, the

County has not established that it is substantially likely to succeed on the merits.  Accordingly, the

Court will not issue a temporary restraining order requiring the Defendants to temporarily suspend

the work on the Project.

## I.     THE COUNTY HAS NOT ESTABLISHED THAT IT WILL SUFFER IRREPARABLE HARM DURING THE LIFE OF THE TRO.

The County has not made a clear showing with its evidence that there will be irreparable harm.

The County identifies two discrete harms that it will allegedly suffer without emergency injunctive

relief.  The first harm is the risk that the Project will delay emergency responders from reaching

injured people and hinder evacuation of the County.  See Transcript of Hearing at 16:3-17:7.  These

concerns emanate from the access control point at the heart of the Project, which the County fears

will bottle up traffic at times when speed is of the essence, such as when medical personnel are

attempting to aid those in harm's way and when residents are fleeing the city because of an imminent

---

[2] This case does not involve one of the categories of "disfavored" injunctions for which the
Tenth Circuit requires a heightened showing,  see O Centro Espirita Beneficente Uniao do Vegetal
v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004)(en banc)(citation omitted), cert. granted, 125 S. Ct.
1846 (2005), and the Defendants do not argue otherwise. First, the relief requested will not alter the
status quo because it will merely order the Defendants to cease construction activities, thereby
preserving the status quo.  Second, a TRO in this case would not be mandatory because it would not
order the Defendants to take any affirmative steps; it would instead order the Defendants to not
continue building the new security measures.  Finally, granting the County's motion will not afford
it all the relief that it could recover at the conclusion of a full trial on the merits because a TRO would
not, for example, order the Defendants to conduct a new EA.

-22-

catastrophe.  See id. at 33:1-23, 34:14-35:18.

In contrast to a lack of a clear showing of irreparable harm, even if the Court accepts the County's characterization of the effects of the access control point as true, the alleged irreparable harm to public safety will not occur, at the earliest, until the access control point becomes operational in August 2006.  See Wilmot Decl. ¶ 6, at 3.  Before the access control point comes online and begins stopping vehicles, it will not imperil traffic patterns in the County.  Indeed, the County conceded that the access control point will not impact the County's emergency response and evacuation plans until the access control point opens for business later this summer.  See Transcript of Hearing at 17:24-18:3.  There is thus no disagreement that any irreparable harm posed by the access control point lies outside the ten-day time frame of a TRO and will occur, if at all, after the Court has ruled on any future motion for a preliminary or permanent injunction.  Without a showing that irreparable harm, in the form of public safety, will take place in the next ten days or before the Court decides the merits of this case, the County has failed to establish the irreparable harm necessary for emergency injunctive relief.

The County also contends that the Defendants' alleged violation of the NEPA process – by pursuing the modified Project under the NEPA Compliance Review rather than a new EA – constitutes irreparable harm that already exists.  See id. at 11:2-5, 44:25-45:7.  To support its argument, the County points to a First Circuit case, Massachusetts v. Watt, 716 F.2d at 946.  In Massachusetts v. Watt, the First Circuit explained that, "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." 716 F.2d at 952 (citations omitted).  From this passage, the County reasons that irreparable harm occurs the instant that a governmental agency violates

-23-

NEPA.

The County's argument does not fully take into account the Tenth Circuit's decision in Davis v. Mineta, 302 F.3d at 1104. The Tenth Circuit decided Massachusetts v. Watts in 1983, before the Supreme Court decided Amoco Prod. Co. v. Village of Gambell in 1987. The Tenth Circuit decided Davis v. Mineta in 2002. While the Davis Court stated that "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure," the Tenth Circuit went on to say that a plaintiff "must still make a specific showing that the environmental harm results in irreparable injury to [its] specific environmental interests." 302 F.3d at 1115. In the Tenth Circuit, then, the County cannot rest its case on the Defendants' alleged NEPA violation; it must also demonstrate how the violation impacted the County's specific environmental interests. Yet the County has not articulated any harm, beyond that to public safety falling outside a TRO's time frame, to its individual interests. It is difficult to make such qualitative judgments on a motion for a TRO, and the Court must therefore find that the County has not made a clear showing of irreparable harm.

The Court is mindful that it must not set the bar too high for environmental plaintiffs. "[A] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative." Greater Yellowstone Coalition v. Flower, 321 F.3d at 1258. While the Court believes that the County still must present evidence that makes a clear showing of significant risk, the Court does not believe that the County has made the showing of a significant risk of irreparable harm before the Court will likely decide the merits. The Court does not believe that the County has made a showing of: (i) a risk; (ii) a significant risk; or (iii) irreparable harm during the time period it will take to decide this case. The evidence in the record that suggests no harm will occur, during the life of this case, gives the Court pause. Without more, the County has failed to establish irreparable harm.

**II.  THE COUNTY HAS NOT ESTABLISHED THAT THE HARM IT WILL SUFFER IF THE COURT DENIES A TRO IS GREATER THAN THE HARM THE DEFENDANTS WILL SUFFER IF THE COURT GRANTS A TRO.**

The Court does not believe that the County has made a clear showing that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party.  Rather than a clear showing one way or another, there is a balance of competing public interests.  The agency itself must deal with competing interests.  The County argues that the balance of harms favors it because the Defendants will suffer, at most, temporary delay in implementing the Project.  See Plaintiff Memorandum at 14.  On the other hand, according to the County, it will suffer the "potential harm of failing to comply with NEPA" if the Court denies it emergency injunctive relief.  Id.  The Defendants assert that granting a TRO, and thus delaying the Project's completion, will continue to expose LANL to the risk of a terrorist attack.  See Response at 15-16.

In balancing the harms to each party, the Court notes that the County does not specify the "harm" it will suffer if the Court denies its request for a TRO.  The County makes only a conclusory assertion that it will suffer harm from the Defendants' alleged failure to comply with NEPA without spelling out what that harm entails.  Assuming that the County is referring to the harm to public safety that it enumerated in its irreparable-harm analysis, the County conceded that this harm will not manifest itself until August 2006, after any TRO issued by this Court will have expired and after the Court will have ruled on the County's request for preliminary or permanent injunctive relief.  See Transcript of Hearing at 17:24-18:3.  Also, while the Defendants' alleged violation may create a presumption of harm, the County must still show that it is a harm to its specific environmental interests, which the County has failed to do.  See Davis v. Mineta, 302 F.3d at 1115.  The only harm, therefore, that the County has given the Court to weigh against the harm to the Defendants is one that

will not come into being for another seven months.

Against a harm that will not materialize for the better part of a year, the Defendants posit a harm that will arise as soon as the Court enters a TRO: delay in the Project's completion.  In turn, this delay poses a risk that terrorists will exploit the temporary security measures adopted by LANL to attack the facility's sensitive nuclear materials, thereby endangering LANL's workers, the people who live in surrounding areas, and ultimately the nation as a whole.

The Court concludes that the County has not shown that it will endure more harm from the denial of a TRO than the Defendants will suffer from the grant of a TRO.  The Defendants will bear a concrete harm existing from the moment the Court issues a TRO, but the County will not suffer any harm to public safety until, at the earliest, August 2006.  As such, the County will suffer no harm regardless whether the Court grants the TRO, but the Defendants will suffer harm if the Court grants the TRO.  Without the County's articulation of how a harm springing from the denial of a TRO offsets the harm the Defendants will incur from the grant of a TRO, the County has failed to satisfy its burden under the balance-of-harms prong.

Even if the threat to public safety existed now, the Court cannot say at this time that it outweighs the danger of delay to the Defendants.  Without prejudicing the Court's consideration of a future motion for a preliminary or permanent injunction in this matter, the Court concludes that the County has not shown that the potential of injury or loss of life to it exceeds the danger, resulting from the cancellation of the Project, to LANL's employees, the community, and the nation from a terrorist attack on this facility.  Without more evidence, the Court declines to find, at this stage, that the balance tips in the County's favor.  The Court cannot say that the harm that the Project will cause will outweigh the harm if the Project is stopped at this time.

-26-

**III.   THE COUNTY HAS FAILED TO SHOW THAT A TRO WILL NOT BE ADVERSE TO THE PUBLIC INTEREST.**

The County has not made a clear showing that the injunction, if issued, would not be adverse to the public interest.  The County alleges that a TRO will uphold the public interest by preventing environmental harm to the areas affected by the Project during the course of this litigation and ensuring that the United States complies with NEPA through enforcement of environmental regulations.  See Plaintiff Memorandum at 15-16.  In contrast, the Defendants assert that issuing a TRO will harm the public interest because it will delay the construction of new security measures needed to protect LANL from a terrorist attack.  See Response at 15-16.

The Court is mindful that Congress and the Supreme Court of the United States have expressed the importance to the public of protecting the environment.  See 42 U.S.C. § 4321; Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. at 545.  The Court also recognizes that the public has a vital interest in ensuring that governmental officials obey the law via litigation in federal court.  See Seattle Audubon Society v. Evans, 771 F. Supp. at 1096 (citation omitted).  Yet the County must still show that a TRO, even one whose goals are to shield the environment from harm or compel obedience by the government to the law, is not adverse to the public interest.  See Amoco Prod. Co. v. Village of Gambell, 480 U.S. at 542; Weinberger v. Romero-Barcelo, 456 U.S. at 313; Kikumura v. Hurley, 242 F.3d at 955.

The County has not carried its burden of showing that the TRO is not adverse to the public interest.  The County has not explained why the delay that the TRO will impose on the Project will not injure the public's interest in a secure nuclear facility.  The County leaves virtually unchallenged the Defendants' representation that they need to complete the Project to safeguard the nuclear activities occurring there.  In light of the Defendants' articulation of the real danger to national

security posed by a delay in completing the Project, and the County's failure to sufficiently rebut the Defendants on this point, the Court finds that the County failed to carry its burden on the public interest prong.

## IV.   THE COUNTY HAS NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

The Court begins its discussion of the merits prong by noting that the County is not entitled to the Tenth Circuit's modified likelihood of success test.  If the irreparable injury, balance-of-harms, and public interest prongs tip sharply in its favor, then a plaintiff may show a likelihood of success "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d at 1083-84 (citation omitted).  While there is a modified likelihood of success requirement if the movant has satisfied the other three requirements for a preliminary injunction, there is no relaxed standard where the movant has not made a clear showing of the equitable requirements.  The County, therefore, should not receive the benefit of the modified likelihood of success standard and must instead show a substantial likelihood of success on the merits.

While the County has certainly given the Court some concerns about the Defendants' decision and procedure, and about the merits of this case, the Court does not believe that the County has made a clear showing of substantial likelihood that it will succeed on the merits.  Although an agency must articulate "a rational connection between the facts found and the choice made," Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. at 285-86 (internal quotations and citations omitted), the Court must normally defer to an agency's interpretation of its own regulations, see Marsh v. Oregon Natural Res. Council, 490 U.S. at 377-78; Bar MK Ranches v. Yuetter, 994 F.2d at 738.  Under the APA, a court must not set aside an agency's decision unless it is arbitrary or

-28-

capricious.  See 5 U.S.C. § 706(2)(A); Friends of the Earth v. Hintz, 800 F.2d at 831.  An action is arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.

The County argues that it has established a substantial likelihood of success on the merits because the Defendants: (i) did not complete a new EA, or a document similar to a Supplement Analysis, for the proposed modifications to the original plan for the Project; (ii) improperly relied on previous EAs in failing to prepare a modified FONSI for the proposed modifications to the Project; (iii) failed to involve the public through review and comment of the NEPA Compliance Review; and (iv) improperly divided the Project into separate parts and failed to address the cumulative impacts of the entire Project.  See Plaintiff Memorandum at 9-13.  The Defendants reply that their decision not to conduct a new EA was based on their conclusion that the environmental effects of the modification to the Project were less than or equal to the environmental impact of the original Project. See Transcript of Hearing at 68:4-9.  The Defendants based their conclusion on the fact that the original Project involved building bypass roads where no roads had previously existed, but the modified Project involved paving new lanes and building checkpoints in areas where roads already exist.  See id. at 71:9-72:21.  Also, the original Project mandated building new roads and bridges in a canyon, requiring extensive construction that would not be necessary in the modified Project, which involved flat terrain.  See id.

The County fails to show, at this stage of the proceedings, that this decision was arbitrary or

capricious. The Defendants have provided a reasonable explanation why they concluded that the modified Project would have no more environmental impact than the original Project: construction under the modified Project, unlike the original Project, would not build new roads in wild terrain but instead would pave new roads next to already existing highways. While the County presented evidence that the new access control point may hinder the movement of vehicles in the County during an emergency, the County has not shown, on the record, why it was arbitrary or capricious for the Defendants to conclude that the landscape would be less affected by paving new roadway at the intersection of Diamond Drive and Jemez Road than by paving new roadway in a canyon where none previously existed.

Similarly, the County has not shown that the Defendants failed to modify the FONSI upon the findings of an adequate EA. The County maintains that the Defendants' EA did not address the environmental effects of the modified Project and so was an improper basis to modify the FONSI. Essentially, the County asserts that the Defendants should have conducted a new EA to support a modified FONSI. The Defendants, however, have explained that they concluded that the modified Project's environmental effects would be less than or equal to the original Project based on the EA's analysis of the original Project. In light of this explanation, the County has not demonstrated – and clearly as it must at this stage of the proceedings – that the Defendants' conclusion was arbitrary and capricious.

Also, the County has failed to establish, at this stage of the proceedings, that the Defendants did not properly involve the public in reviewing and commenting on their decision to not commission a new EA. The Defendants explain that they provided the County with each NEPA Compliance Review and have met regularly with the County to discuss the Project. See Wilmot Decl. ¶ 5, at 2-3.

While the County disputes the Defendants' assertion that it kept the County apprised of its plans, see Transcript of Hearing at 19:7-13, this dispute prevents the Court from saying at this time that the County is substantially likely to prevail on this argument.

Finally, the County has not shown – at this stage of the proceedings – that the Defendants improperly divided the Project into separate parts, thereby failing to address the cumulative impacts of the entire Project. The Defendants stated at the hearing that they considered the environmental impact of the modified Project and concluded that it would pose less of a risk than the original Project. The County did not show at the hearing – as it clearly must to secure a TRO – that this assessment arbitrarily and capriciously ignored the requirement of a cumulative impact assessment by focusing on each individual modification rather than the proposed whole.

In its analysis of each of the County's and the Defendants' arguments, the Court wishes to make clear that it is not prejudging future arguments that the parties may bring before it. It may well be the case that the County will present evidence, in the future, that the County is entitled to injunctive relief based on the Defendants' alleged violation of NEPA. The Court cannot, without further work, say who is right and who is wrong, and, in any case, that is not the role of the Court at this stage. The County has failed to make the clear showing it needs to make at this stage. As a result, the Court will not grant the County a TRO.

**IT IS ORDERED** that the Plaintiff's Notice of Motion for Preliminary Injunction is treated as a motion for a temporary restraining order and is denied. The Court further treats the County's request for a preliminary injunction as withdrawn unless the County informs the Court that it desires a hearing on a preliminary injunction.

UNITED STATES DISTRICT JUDGE

Counsel:

Barry P. Steinberg
Kutak Rock
Washington, D.C.

– and –

Peter A. Dwyer
  Los Alamos County Attorney
Daniel A. Gonzales
Charles Rennick
  Assistant County Attorneys
Los Alamos, New Mexico

      *Attorneys for the Plaintiff*

Sue Ellen Wooldridge
  Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice
Washington, D.C.

– and –

Jeffrey S. Dillen
Benjamin Longstreth
  Trial Attorneys
National Resources Section
Environment & Natural Resources Division
United States Department of Justice
Washington, D.C.

– and –

Andrew A. Smith
  Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
c/o United States Attorneys Office
Albuquerque, New Mexico

*Attorneys for the Defendants*